IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AIMEE MAE AUSTIN, | ) | Case No. 1:19-cv-2380 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Aimee Mae Austin, seeks judicial review of the final decision of the

Commissioner of Social Security denying her application for Supplemental Security Income

("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).   Because the Administrative Law Judge

("ALJ") applied proper legal standards and reached a decision supported by substantial evidence,

and because any error in the ALJ's decision was harmless, I recommend that the Commissioner's

final decision denying Austin's application for SSI be affirmed.

## II.     Procedural History

Austin applied for SSI on September 27, 2016.  (Tr. 386).[1]  She alleged that she became

disabled on February 6, 2014 due to borderline personality disorder, severe anxiety and

---

[1] The administrative transcript is in ECF Doc. 10.  Austin filed a previous claim that was dismissed when she failed to appear at a hearing.  (Tr. 318-322).

depression, ulcers, spastic colon, irritable bowel syndrome, gerd, acid reflux, lordosis and scoliosis.  (Tr. 386, 408).  The Social Security Administration denied Austin's applications initially and upon reconsideration.  (Tr. 324-326, 349-350).  Austin requested an administrative hearing.  (Tr. 353).  ALJ Michael F. Schmitz heard Austin's case and denied the claim in a November 7, 2018, decision.  (Tr. 136-151).  On August 19, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4). On October 14, 2019, Austin filed a complaint challenging the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Relevant Medical Evidence

Austin established primary care with Dr. V. Girdhar on January 21, 2016.  (Tr. 480-482). Austin reported a history of GERD, asthma, tobacco abuse.  Dr. Girdhar prescribed an inhaler and a nicotine patch.  At a follow-up appointment on February 18, 2016, Austin complained of difficulty sleeping.  Dr. Girdhar prescribed Trazodone.  He did not observe any abnormal physical findings but noted that Austin seemed sad but pleasant and cooperative.  She had good eye contact and no thought disorder.  Dr. Girdhar diagnosed anxiety and adjustment insomnia. (Tr. 478-479).  In March 2016, a physical examination returned normal findings.  Dr. Girdhar increased Austin's Trazodone dosage.  (Tr. 476-477).

In June and July 2016, Dr. Girdhar noted tenderness, multiple trigger points, and mildly limited range of motion in the low back.  Straight leg tests were negative.  Dr. Girdhar prescribed a muscle relaxant, cyclobenzaprine.  (Tr. 471-474).  His findings were similar in November, but Austin complained of anxiety and tingling in her legs when trying to sleep.  Dr. Girdhar diagnosed restless leg syndrome, depression, and unspecified personality disorder.  He prescribed Celexa, Lamictal and gabapentin.  (Tr. 527-529).

On January 4, 2017, Austin reported paresthesia in her legs and fingertips, but improved psychiatric symptoms.  Dr. Girdhar noted diminished sensation in the fingertips, clear lungs, and unchanged back findings.  He diagnosed restless leg syndrome, asthma, obesity, low back pain, anxiety, and bipolar disorder and adjusted her medications.  (Tr. 517-518).

Austin saw Dr. Girdhar's nurse practitioner, Amy Westfall, on January 30, 2017.  Nurse Westfall's examination resulted in normal findings including unremarkable low back and normal joints.  (Tr. 510-511).  Austin reported an eight-year history of back pain secondary to a motor vehicle accident and requested Valium and tramadol.  Nurse Westfall prescribed a one-week supply of Valium and a five-day supply of Norco.  (Tr. 509-510).

On the same day, January 30, 2017, Austin established care at a different primary care clinic.  She saw nurse practitioner, Sally Shull-Diener, and requested a refill of Valium and tramadol.  Ms. Diener charted normal examination findings.  She diagnosed bipolar, borderline personality disorder, schizoaffective disorder, GERD, mild persistent Asthma, psychosis and anxiety.  Ms. Diener referred Austin to pain management for medications.  (Tr. 622-623).

In February 2017, Austin underwent a physical therapy evaluation by Loretta Vojto, PT, MPT.  She reported falling due to dizziness and a history of low back pain since childhood causing difficulty walking and performing self-care.  Her gait was slow and labored; she was assisted by her boyfriend.  The therapist noted that there was no observable misalignments or scoliosis.  (Tr. 570).  Muscle testing was normal except for "general weakness" in the legs and reduced low back range of motion.  The therapist advised Austin to use a cane for ambulation if she felt unsteady.  (Tr. 570-571).  The therapist's goal for the initial six weeks stated: "Patient to use a standard cane if unable to walk independently."  (Tr. 571).

On March 3, 2017, pain specialist, Joshua Goldner, M.D., treated Austin.  She reported a long history of widespread body pain.  Austin was using a cane and her gait was slightly

3

antalgic.  Dr. Goldner found that Austin had decreased low back range of motion and more than 11 typical fibromyalgia tender points.  However, she had normal strength, sensation, muscle tone, mood, affect, memory and judgment.  (Tr. 596).  Dr. Goldner diagnosed fibromyalgia, but also referred Austin to a rheumatologist to rule out any other systemic cause of her symptoms. (Tr. 596).

On March 21, 2017, Austin underwent an initial psychiatric assessment with nurse practitioner, Patricia Bartosik.  (Tr. 618).  Austin's chief complaints were physical, related to her spine and scoliosis.  Mental status examination showed appropriate demeanor; full orientation; coherent speech; normal psychomotor activity; good concentration and abstraction ability; fair insight, judgment and memory; irritable, depressed and angry mood; appropriate but labile affect; and thought content notable for feelings of worthlessness and guilt and a history of self-cutting and hallucinations.  (Tr. 618).  Ms. Bartosik diagnosed PTSD, dysthymic disorder, schizoaffective disorder, and borderline personality.  She prescribed prazosin for Austin's nightmares.  (Tr. 619).

Austin followed-up with Ms. Bartosik on April 17, 2017.  Ms. Bartosik noted all normal findings including euthymic mood and appropriate affect, except for slowed psychomotor activity.  She changed Austin's medication due an interaction with one of her other medications. (Tr. 615).  On May 17, 2017, Ms. Bartosik noted that Austin reported having a lot of issues and seemed to be "medication seeking."  (Tr. 612).  Ms. Bartosik prescribed a trial of low-dose Risperdal for mood stabilization.  (Tr. 613).  In Bartosik's Progress Toward Goals and Objectives section, she stated: "Fairly stable with no acute symptoms evident.  Appears to be over reporting symptoms in general with seeking pain medications, etc." (*Id.*).

On April 12, 2017, Dr. Rajiv Taliwal examined Austin.  (Tr. 577).  He noted partial range of motion in Austin's low back, but also that she was ambulating without difficulty.  (Tr. 577).

4

He also observed 5/5 motor strength and hip range of motion, normal sensation in the legs, and negative special clinical tests including straight-leg raise test.  (Tr. 577-578).  Dr. Taliwal opined that Austin had osteoarthritis of her spine with radiculopathy in the lumbosacral region.  (Tr. 578).  X-ray images showed mild disc degeneration with no misalignment.  (Tr. 580).  An MRI showed a L5/S1 right paracentral 3 mm disc protrusion/herniation and broad-based posterior disc bulge, an annular defect/annular tear at L4/L5 with tiny disc bulge and trace spondylolisthesis; mild lower lumbar facet degenerative hypertrophy, and deep subcutaneous dependent edema at L2/3.  (Tr. 582-583).  Dr. Taliwal discussed operative and non-operative treatment options with Austin.  (Tr. 587).

On May 23, 2017, Austin initiated treatment with pain management specialist, Dr. Michael Louwers.  Austin reported that previous pain management had not helped and that she was in so much pain that she had to use a wheelchair.  (Tr. 675).  Examination revealed normal strength, gait, sensation and range of motion in the neck, low back, arms, and legs, negative straight leg raise test, tenderness in the paraspinal muscles, and neck trigger points.  (Tr. 675-677).  Dr. Louwers diagnosed chronic pain syndrome and myalgia, consistent with fibromyalgia. He ordered lab work to rule out any inflammatory or chronic autoimmune condition.  He did not feel that injections would be successful.  He advised that she stop smoking, reduce her weight and begin exercising.  He noted that there were no indications for a cane or wheelchair.  (Tr. 678).

Austin followed-up with Dr. Louwers on June 13, 2017.  He was able to rule-out lupus and rheumatoid arthritis and confirmed the fibromyalgia diagnosis.  He prescribed Lyrica and an anti-inflammatory, Nabumetone.  He restated that he saw no indication for a cane or wheelchair. (Tr. 673-674).

Austin returned to Ms. Bartosik on June 21, 2017.  Her mental status examination was normal except that she reported auditory hallucinations.  She also reported some improved mood stability on Risperdal, and Ms. Bartosik increased her dosage.  (Tr. 609).

Austin treated with Catherine, Taras, M.D., on July 30, 2017 for swelling in her legs and feet.  Dr. Taras noted slight (+1) swelling and prescribed a diuretic.  (Tr. 639-643).  Austin returned to Dr. Taras on August 8, 2017 and reported improvement.  Dr. Taras noted trace swelling but otherwise normal findings.  (Tr. 702-704).

In mid-2017, Austin began meeting with a qualified mental health specialist, Brittany Kunda, for case management services.  Ms. Kunda helped Austin access local food pantries and contacted her wireless service provider.  (Tr. 896-897, 903, 943, 995).  Ms. Kunda observed a range of mental status findings, such as flat or appropriate-but-flat affect; mood that was depressed or euthymic, but anxious, normal attention; fair or better communications skills; good comprehension; normal or normal-but-preoccupied concentration; cooperative demeanor; and coping ability ranging from "ineffective" to effective and/or resilient.  (Tr. 937-968).  In October and November 2017, Ms. Kunda noted that Austin was functioning well and within normal baseline.  (Tr. 943, 947).

On August 9, 2017, Austin saw Dr. Louwers's assistant, Holly Zeller.  Ms. Zeller increased Austin's dosage of Lyrica and encouraged aerobic exercise.  (Tr. 667-669).  Austin followed-up with Ms. Zeller in September.  She was ambulating with a cane and reported no improvement.  However, Ms. Zeller made no medication changes.  (Tr. 663-665).

Austin returned to Ms. Bartosik for medication management on September 27, 2017.  (Tr. 682).  Austin reported no medication side effects and no hallucinations.  Ms. Bartosik's findings were normal except for an anxious, depressed mood.  She made no medication changes.  (Tr. 682-683).

On October 10, 2017, Austin treated with Dr. Louwers, whose findings were unchanged. Dr. Louwers diagnosed fibromyalgia, chronic pain syndrome and myalgia.  (Tr. 658-661).  He stated that opioids were not indicated, and he did not recommend injections.  He advised that Austin exercise, reduce her weight, try some herbal/natural supplements, and that there was "no indication for a cane or [wheelchair.]"  (Tr. 661).

Austin saw Ms. Bartosik on November 22, 2017.  Ms. Bartosik noted an irritable mood, an appropriate, but blunted, affect and restless psychomotor activity.  Austin reported auditory hallucinations and described numerous external stressors.  Ms. Bartosik continued Austin's medications.  (Tr. 680-681).

On November 29, 2017, Austin saw social worker, Shannon Holb, who noted that Austin had not been seen for counseling in five months.  (Tr. 894-895).  Ms. Holb noted that there were no significant changes since their last meeting.  (Tr. 894).  On December 14, 2017, Ms. Holb again noted no significant changes.  However, Austin smiled a few times and was more interactive during this session.  (Tr. 892-893).  In January 2018, Ms. Holb noted that Austin was more talkative, but resisted suggestions for positive  change.  (Tr. 889).

Austin saw Ms. Zeller for medication management on January 15, 2018.  (Tr. 687).  Ms. Zeller refilled Austin's prescriptions, encouraged aerobic exercise, and noted that there was no indication for a cane or wheelchair.  (Tr. 689-690).  Ms. Zeller made similar findings and recommendations in April 2018.  (Tr. 752-754).

Austin was transported by ambulance to the emergency room on May 15, 2018 for low back pain.  (Tr. 758-761).  She was transported by ambulance to the emergency room again on May 23, 2018 for a contusion of her left lower leg incurred when she went fishing.  (Tr. 806).

Austin saw Dr. A. Harris Basali for pain management on June 11, 2018.  (Tr. 974-977). Austin complained of lower back pain moving into her hips, legs and knees.  She reported pain

exacerbation with prolonged sitting and standing, movement, walking, climbing stairs, bending forward, bending backwards, twisting or rotational movements, stretching or reaching, lifting a heavy weight, working or driving.  (Tr. 974).

Additional evidence was submitted to the Appeals Council.  Austin continued treating with Dr. Basali for pain management.  (Tr. 11-28, 43-46, 50-52, 64-81, 84-91).  Dr. Basali referred Austin to an orthopedist, Bradly Inkrott, M.D., who Austin saw on March 7, 2019.  (Tr. 32-40).  In March 2019, Dr. Basali administered a nerve root block (Tr. 50-51).  In April 2019, Austin received a sacroiliac joint injection (Tr. 25-27), and in June 2019, she received a caudal epidural steroid injection.  (Tr. 11-13).

Austin also continued treating at Alternative Paths for psychological impairments.  (Tr. 101-129).

**B.     Relevant Opinion Evidence**

**1.     Consulting Examiner – E.M. Bard, Ph.D.**

On December 12, 2016, Austin underwent a psychological consultative examination with E.M. Bard, Ph.D.  Austin was not able to recall the location of the examination and made two errors when attempting to count backwards.  Austin's fiancé reported that she was frequently argumentative, high strung, tense, under-active, lacked energy and appeared unhappy and depressed.  (Tr. 498).  Dr. Bard noted a "somewhat subdued" mood, cooperative attitude, mildly sad and blunted affect, unremarkable behavior, satisfactory eye contact, relevant, coherent and clear speech, no overt signs of anxiety - despite her reports of panic attacks, and her thought content was notable for paranoia and a history of hallucinations.  (Tr. 497-498).  Austen scored in the deficient range on the mini-mental state examination, and Dr. Bard estimated her intelligence to be in the low average range.  (Tr. 498).  Dr. Bard diagnosed persistent depressive disorder with anxious distress and psychotic features.  He opined that Austin might have

8

difficulty interacting with authority figures, co-workers, and the public; would have difficulty dealing with anticipated pressures in a competitive work setting; was able to perform simple and multi-step tasks; and had no difficulties understanding, remembering, or carrying out instructions.  (Tr. 499-500).

### 2.  Consulting Examiner – Mark Vogelsang, M.D.

After her administrative hearing, on September 19, 2018, Austin was referred to Dr. Mark Vogelsang for a consultative exam.  (Tr. 1004-1007, 1013).[2]  Dr. Vogelsang diagnosed obesity, fibromyalgia, and a history of depression and anxiety.  (Tr. 1006).  He noted that Austin's fibromyalgia and low back pain seemed to be related.  Austin said that she was interested in a job in nursing.  Dr. Vogelsang opined that Austin could perform light to sedentary work, but that nursing would require extensive bending and twisting and she may need to avoid doing steps until she had better treatment for her lower back.  He also opined that she may need to rest periodically during the day.  (Tr. 1007).

### 3.  State Agency Consultants

On November 9, 2016, state agency reviewing consultant, Timothy Budnik, D.O. reviewed Austin's medical records and opined that she had no severe physical impairments.  (Tr. 295).  On March 7, 2017, state agency reviewing consultant, Leon D. Hughes., reviewed Austin's medical records and agreed with Dr. Budnik's opinions.  (Tr. 305-309).

On December 19, 2016, state agency reviewing psychologist, David Dietz, Ph.D., reviewed Austin's records and opined that she was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity

---

[2] The first page of the report is at p. 1013 of the transcript.

with others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others.  Dr. Dietz opined that Austin could perform simple, routine, repetitive task at a steady, moderate pace for a normal workday and work week; could interact for brief periods with co-workers or the public, but might be hypersensitive to criticism from supervisors; and could adjust to infrequent changes if given advance notice and work in an environment where duties were fairly static.  (Tr. 298-300).  On March 3, 2017, state agency reviewing consultant, Kristen Haskins, reviewed Austin's records and agreed with Dr. Dietz's opinions. (Tr. 312-314).

## C.    Relevant Testimonial Evidence

Austin testified at the ALJ hearing.  (Tr. 263-281).  She was 30 years old and was living with her fiancé of two years, who was disabled.  (Tr. 264, 277).  Her case manager brought her to the hearing because she did not drive.  She had never driven due to her anxiety.  (Tr. 264) Austin had completed high school and had started training to be a certified nursing assistant, but she had not completed that training.  She had previously worked in a shelter - cleaning, passing out medications and cooking.  (Tr. 265).  However, she had not worked long enough at any job for it to be counted as "past relevant work."  (Tr. 267).

Austin testified that she was unable to work due to anxiety.  She saw a psychologist once every three months, a counselor twice a month, and a case worker once a week.  (Tr. 268). Austin was taking Lamictal and trazodone.  (Tr. 269).  She testified that she had frequent panic

attacks, sometimes two or three times a day.  They lasted two to three minutes and were triggered by leaving her house.  (Tr. 270).   She had never been hospitalized for panic attacks. (Tr. 271).

Austin had asthma and used an inhaler.  (Tr. 275-276).  She also suffered from depression that caused crying spells two times a week and flashbacks.  (Tr. 272).  She complained of pain all over her body (Tr. 275), most severe in her lower back that traveled to her hips and legs.  (Tr. 273).  She used a TENS unit to help with pain.  She stated that it was hard to sit or stand for long periods.  She estimated that she could stand for five to six minutes and could sit for a half an hour.  (Tr. 273).

Austin's physical therapist recommended that she use a cane, and she had been using it for approximately a year.  (Tr. 274).  Austin testified that physical therapy had not helped and had made things worse.  (Tr. 275).  She had also received an injection, which provided relief for about two weeks, but she had been unable to receive more injections after becoming pregnant. (Tr. 274).

On a typical day, Austin got up, smoked a cigarette, played Xbox for a couple of hours and checked Facebook.  She alternated between sitting and standing when playing Xbox.  (Tr. 276, 278).  She did not eat breakfast or lunch, only dinner.  Her fiancé did the shopping and dishes.  His mother did their laundry.  She and her fiancé would occasionally walk on a path or down the street to the café.  (Tr. 277).   She sometimes went fishing with her brother on the weekends.  (Tr. 279-280).

Vocational Expert ("VE") Kevin Yi also testified at the hearing.  (Tr. 281-).  The VE testified that an individual who could perform light work, except that she could frequently balance, occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; could frequently reach with the bilateral upper extremities; could

11

occasionally be exposed to humidity, and extremes of temperature, but must avoid all exposure

to workplace hazards, such as unprotected heights; was limited to the performance of simple,

routine, repetitive tasks, undertaken in a work setting free of production rate pace (as is found in

assembly line work) in a routine setting – with no more than occasional changes in workplace

tasks or duties, easily explained and/or demonstrated in advance of gradual integration into the

job's processes; in a setting requiring no more than occasional and superficial interaction with

co-workers, supervisors or the public (defined as precluding group, tandem, or collaborative

tasks, as well as tasks involving sales, arbitration, negotiation, conflict resolution, confrontation,

the management of, direction of or persuasion of others), would be able to perform the jobs of

housekeeping cleaner, merchandise marker and mailroom clerk.  (Tr. 284).  If the individual

needed to use a cane and was limited to sedentary work, she would be able to perform the jobs of

charge account clerk, laboratory tester, and final assembler.  (Tr. 285).  However, Mr. Yi

testified that for unskilled jobs, the cane would require an accommodation from the employer.

(Tr. 286).  Mr. Yi testified that his answers were consistent with the *Dictionary of Occupational

Titles* ("DOT").  (Tr. 286-287).  Based on his own experience, Mr. Yi opined that employers

would tolerate a loss of 10% production and two absences from work per month.  (Tr. 286).

## IV.    The ALJ Decision

The ALJ made the following paraphrased findings relevant to this appeal:

4.  Austin had the residual functional capacity to perform light work, except that
    she could frequently balance, occasionally stoop, kneel, crouch, crawl, climb
    ramps and stairs, but could never climb ladders, ropes or scaffolds; could
    frequently reach with the bilateral upper extremities; could occasionally be
    exposed to humidity, and extremes of temperature, but must avoid all exposure
    to workplace hazards, such as unprotected heights; was limited to the
    performance of simple, routine, repetitive tasks, undertaken in a work setting
    free of production rate pace (as is found in assembly line work) in a routine
    setting – with no more than occasional changes in workplace tasks or duties,
    easily explained and/or demonstrated in advance of gradual integration into the
    job's processes; in a setting requiring no more than occasional and superficial

12

interaction with co-workers, supervisors or the public (defined as precluding group, tandem, or collaborative tasks, as well as tasks involving sales, arbitration, negotiation, conflict resolution, confrontation, the management of, direction of, or persuasion of others).  (Tr. 142).

9. Considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Austin could perform, through the date last insured. (Tr. 149).

Based on all of his findings, the ALJ determined that Austin was not under a disability since September 17, 2016, the day she filed her application.  (Tr. 150).

## V.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is

not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter, 78 F.3d 305, 307* (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010)  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.  Substantial Evidence Supported the ALJ's Decision

Austin argues that the ALJ failed to properly evaluate the evidence supporting her claim. ECF Doc. 12 at 13-19.  First, Austin argues that the ALJ improperly disregarded the findings of Dr. Vogelsang, who evaluated Austin's physical impairments after her disability hearing.  At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).[3]  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Because Dr. Vogelsang examined Austin once, at the request of the ALJ, he was not a treating source and the ALJ was not required to assign controlling weight to his opinion or provide good reasons for assigning less than controlling weight.  "[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a

---

[3] 20 C.F.R. §§ 404.1527, 416.927 applies to Austin's claim because she filed it before March 27, 2017.

whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c).  Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375.  An ALJ does not need to articulate good reasons for the weight assigned to a nontreating source opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).

Here, the ALJ properly evaluated Dr. Vogelsang's opinion as required by the regulations. The ALJ assigned "marginal" weight to his opinion, explaining:

> Dr. Vogelsang examined the claimant on a single occasion and is reporting within the bounds of his professional certifications.  This opinion, in the sense that it identifies the need for exertional and postural limitations is marginally consistent with, and supported by, the overall evidence of record, described in digest form in the preceding paragraph.  However, as to the specific degree of limitations that would appertain, the opinion is cryptic and less than helpful in assessing the residual functional capacity.  This opinion is afforded marginal weight.

(Tr. 148).  The ALJ noted that Dr. Vogelsang examined Austin once and that he identified certain limitations.  However, the ALJ found that Dr. Vogelsang's opinion was "cryptic" or vague in describing the precise limitations that needed to be incorporated into Austin's RFC.  Dr. Vogelsang stated, in relevant part:

> The fibromyalgia and the low back pain appear to be interconnected.  Most of her difficulties come for the low back.  On today's physical examination a lot of this back pain appears to be musculoskeletal in nature with negative straight leg raise testing.  She had fairly good mobility of the low back except for mild decrease in flexion.
>
> When asked what he claimant would like to do she would like to work in nursing.  Based on today's clinical examination, the claimant may be able to do very light to sedentary work.  She may have to do extensive bending or twisting and may have to avoid doing steps until she has better treatment for her lower

> back.  She may need to rest periodically during the day.  The hips do not appear
> to be causing any difficulty according to our testing.

(Tr. 1006-1007).  Dr. Vogelsang's opinion that Austin may have to do extensive bending or

twisting seems to have been related to her desire to work in the field of nursing – a physically

demanding field.  But the ALJ was not required to consider whether Austin was capable of

working as a nurse, he was required to consider whether there were any jobs in the national

economy that she could perform.  Dr. Vogelsang's opinion did not provide any specific

limitations and did not explain how long Austin would need to rest.  Overall, the court agrees

with the ALJ that Dr. Vogelsang's opinion was not of much value in the determination of

Austin's RFC.  And the ALJ was not required to provide any greater statement of his reasons for

the weight he assigned to Dr. Vogelsang's examining opinion.  *See Smith,* 482 F.3d at 876.  The

ALJ properly evaluated Dr. Vogelsang's opinion and did not err in assigning only marginal

weight to it.

Austin also argues that the ALJ erred in how he weighed the opinion evidence of the state

agency physicians, Dr. Dietz and Dr. Haskins, and the consulting psychological examiner, Dr.

Bard.  Dr. Dietz offered an opinion regarding Austin's mental limitations after reviewing her

records on December 19, 2016.  (Tr. 298-300).  Dr. Haskins reviewed Austin's records and

issued an opinion on March 3, 2017.  (Tr. 312-314).  After summarizing the reviewing

physicians' opinions, the ALJ stated:

> The opinion of Dr. Haskins overstates, to slight degree, the claimant's social
> limitations, but is generally consistent with, and supported by, the evidence of
> record and so is afforded considerable weight.  The opinion of Dr. Diets [*sic*]
> is broadly reflective of the types of limitations that would appertain, but his opinion
> understates the claimant's social and adaptive limitations.  This opinion is
> afforded only partial weight.

Regarding Dr. Bard's consultative examination, the ALJ stated:

17

> The consultative psychological examiner, E.M. Bard, Ph.D., indicated that the claimant would have no limitations in her ability to understand, remember and carry out instruction, would have some limitations in maintaining concentration, persistence and pace, would have substandard ability to adapt to workplace changes and may have some difficulties related to others. Dr. Bard examined the claimant on a single occasion and was reporting within the bounds of her professional certifications and specialty. As this opinion indicates limitations in three of the four, psychologically based, work-related areas of function, it is at least partially consistent with, and supported by, the overall evidence of record, discussed in digest form in the preceding paragraph. However, the claimant appears to have some limitation in her ability to understand, remember and carry out tasks, and, as to the specific degree of work related limitation that would appertain, this opinion is vague and therefore less than helpful. In consequence, the opinion is afforded only partial weight.

(Tr. 149).

As with the ALJ's evaluation of Dr. Vogelsang's opinion, Austin has not shown that the ALJ erred in his assessment of the reviewing and consulting psychological experts. The ALJ was neither required to assign controlling weight to these opinions nor to provide good reasons for assigning them less than controlling weight. He appears to have balanced their opinions with other evidence from the record and assigned weight accordingly. The ALJ did not err in applying the agency's legal standards to the opinions of the non-treating psychological experts.

The ALJ must consider all relevant medical and other evidence in determining a claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5. Here, in addition to the medical opinions, the ALJ considered Austin's psychological diagnoses, her medications that were partially effective, her regimen of counseling, and her medical treatment notes, which included many normal to mildly adverse findings. (Tr. 146). He also considered her own statements regarding her abilities to interact with others and care for herself. (Tr. 147).

18

Austin argues that the ALJ erred by finding that she had severe psychological impairments, but then not incorporating any of the psychological-impairment limitations expressed in the medical opinions into her RFC.  Austin contends that the ALJ did not make clear the evidence upon which he relied and, therefore, there is no substantial evidence to support his RFC determination as to her mental impairments.  ECF Doc. 12 at 15.  Contrary to Austin's argument, the ALJ was not required to adopt any one of the medical opinions in the record.  The Sixth Circuit has rejected a *per se* rule that ALJs must draw from supporting medical opinions when constructing the RFC.  As it recently noted, the court has declined to adopt "the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); see also *Shepard v. Comm'r of Soc. Sec*., 705 F. App'x 435, 442 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that Shepard was capable of light work").  It is the ALJ who has final responsibility for determining the RFC.  *Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013) (citing SSR 96-5p, 1996 SSR LEXIS 2, 1996 WL 374183 (July 2, 1996); see also 20 C.F.R. § 404.1527(d)(2) (2016) (noting that no "special significance" is given to medical opinions on a claimant's RFC).  As such, "to require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Id.* (quoting SSR 96-5p, 1996 SSR LEXIS 2 at *6, 1996 WL 374183, at *2).

Here, the ALJ considered the evidence in the record when he determined Austin's psychological RFC, and his RFC determination was supported by substantial evidence.  He

included several limitations related to Austin's mental impairments in the RFC (Tr. 142), and he found that Austin was *more* limited than opined by Dr. Dietz and Dr. Bard.  (Tr. 149).  The ALJ was not required to adopt any one of the medical source opinions because it was for him, not a medical source, to determine whether Austin was under a disability.  Austin has failed to demonstrate any error in how the ALJ chose to incorporate only portions of the medical source opinions related to Austin's psychological impairments in determining her RFC.

Austin also argues that the ALJ failed to properly evaluate Austin's fibromyalgia impairment in accordance with Social Security Ruling 12-2p.  ECF Doc. 12 at 15.  Austin has not, however, fully developed this argument.  She has not cited any evidence indicating that her fibromyalgia caused greater limitations than the ALJ found.  Although fibromyalgia is not a listed impairment, an ALJ must consider whether a claimant's fibromyalgia, singly or in combination with other medically determinable impairments, causes functional limitations that medically equal a listed impairment.  SSR 12-2p, 2012 SSR LEXIS 1 *17 (Jul. 25, 2012).  Here, the ALJ found that fibromyalgia was one of Austin's severe impairments.  (Tr. 139).  He noted that she had more than eleven tender points on examination in March 2017 and had been diagnosed with the condition.  (Tr. 145).  He considered how this condition was being treated and whether it would affect Austin's ability to work.  He incorporated certain limitations into the RFC to account for the symptoms she experienced.  (Tr. 145).  Thus, the ALJ expressly considered Austin's fibromyalgia and resulting limitations in accordance with SSR 12-2p. Austin has not argued that her fibromyalgia caused any greater limitations than those assessed by the ALJ, and she has failed to show that the ALJ misapplied SSR 12-2p or made any other error related to her diagnosis of fibromyalgia.

Austin also assigns error to the ALJ's consideration of diagnostic imaging of her back. ECF Doc. 12 at 17.  She argues that the ALJ properly found the imaging to be consistent with

her statements of pain, but incorrectly found it to be inconsistent with the severity of limitations she reported. *Id.* (Tr. 140, 144).  Austin's argument is weakened because she has not cited any supporting evidence suggesting that these conditions caused greater functional limitations than the ALJ found.  The ALJ considered the objective medical evidence and acknowledged that the imaging showed conditions that would explain Austin's pain.  (Tr. 144).  However, he also noted that clinical examinations indicated that Austin's functional capabilities were minimally impacted by her back problems.  He noted examinations reporting no tenderness, good range of motion, normal strength, negative straight leg raises, normal gait, reflexes and sensation.  (Tr. 145).  Thus, it appears that the ALJ properly considered all the evidence and determined that Austin's back impairments did not preclude all work.  Austin has not demonstrated any error in the ALJ's consideration of the diagnostic imaging evidence.

Austin also argues that the ALJ erred by not discussing her treatment notes from Alternative Paths or the fact that she had reported having hallucinated.  ECF Doc. 12 at 18.  To the contrary, the ALJ summarized a portion of Austin's mental status examinations, including the fact that she reported auditory hallucinations.  He also noted that many of the examinations yielded only mild or normal findings and that the overall record did not show that Austin's mental impairments would prevent her from functioning in the workplace.  (Tr. 146).  Austin complains that the ALJ only cited three treatment notes, but the ALJ was not required to summarize all of her treatment notes.  *Boseley v. Comm'r of Soc. Sec.,* 397 F. App'x. 195, 199 (6th Cir. 2010).  The ALJ was required to consider the medical record as a whole; and he did just that, stating that he gave "careful consideration to the entire record."  The obligation to *consider* the entire record is not an obligation to summarize the entire record.

Austin cites records showing that she was receiving treatment for her psychological symptoms, but she has not cited any record showing that her psychological symptoms would

prevent her from performing work.  Austin's desire that the ALJ should have interpreted the evidence differently does not mean that his decision lacked the support of substantial evidence. The ALJ properly summarized the record evidence and cited support for his findings.  He did not err in his evaluation of the medical source opinions and did not disregard Austin's fibromyalgia or psychological impairments.  Because the ALJ's decision was within his "zone of choice," I recommend that it be affirmed.  *Mullen,* 800 F.2d at 545.

### C.      RFC and Burden at Step Five

Austin also argues that the ALJ's RFC finding was not supported by substantial evidence because he did not include her use of a cane as an additional limitation in the hypothetical questions to the VE at the administrative hearing.[4]  ECF Doc. 12 at 20-21.  At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See Id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the

---

[4] Austin also refers to the VE's testimony regarding being off task and absenteeism.  ECF Doc. 12 at 20. However, in contrast to her argument concerning her need for a cane, she has not cited any evidence establishing that she would have been off task or missed more work that most employers would tolerate. Because there is no indication in the record that this was a relevant concern, the ALJ did not err by failing to incorporate it into the RFC or by failing to provide an explanation.

claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitation he finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Here, the ALJ determined that Austin was capable of performing a range of light work. He asked the VE a hypothetical question about an individual who could perform light work and the VE responded that there would be work for such an individual.  The ALJ also asked the VE how his response would be impacted if the individual could only perform sedentary work and required a cane to ambulate.  (Tr. 284).  The VE's response was more equivocal, but he nevertheless responded that there would be work for someone at the sedentary level who used a cane.  (Tr. 284-286).  Ultimately, the ALJ did not rely on this second line of questioning and testimony from the VE because he found that Austin could perform work at the light exertional level and did not include the use of a cane in her RFC.  Because of the VE's responses to the second hypothetical question, the record contained evidence showing that a significant number of jobs could be performed at the sedentary level by someone who used a cane and otherwise had the same RFC as Austin.  (Tr. 284-286).

The Commissioner argues that the ALJ was not required to include the use of a cane in his RFC or in his hypothetical questions of the VE.  If I were authorized to conduct an independent analysis of the record, I would agree.  "[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work."  *Murphy v. Astrue*, 2013 U.S. Dist. LEXIS 30492, 2013 WL

829316, at *10 (M.D. Tenn. March 6, 2013), citing *Carreon v. Massanari,* 51 Fed. App'x 571, 575 (6th Cir. 2002); *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* 2018 U.S. Dist. LEXIS 32651, 2018 WL 1136119, at *15 (N.D. Ohio Feb. 12, 2018), report and recommendation adopted, 2018 U.S. Dist. LEXIS 32642, 2018 WL 1083252.  To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," i.e., the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*, 2013 U.S. Dist. LEXIS 30492, 2013 WL 829316, at *10 (internal citations omitted).  "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE."  *Id*.

The problem here is that the ALJ's decision did not even mention Austin's use of a cane, despite the fact that he was clearly aware of it.  (Tr. 274).  He asked about it at the administrative hearing, and Austin told him that her physical therapist had prescribed it.  (Tr. 274).  He also asked the VE a hypothetical question about an individual who needed a cane to ambulate.  (Tr. 284).  Moreover, treatment notes confirm that Austin's physical therapist recommended the use of a cane – at least for six weeks – when Austin felt unsteady or "if [she was] unable to walk independently."  (Tr. 571).  Other treatment notes show that Austin used a cane at some of her appointments.  (Tr. 596, 665).

As noted above, the undersigned generally agrees with the Commissioner that the ALJ was not required to find that Austin needed a cane to ambulate because such a finding would have been supported by evidence in the record.  Austin's physical therapist was not an acceptable medical source and only "recommended" that Austin use a cane when unable to walk independently.  *See* facts discussed at page 3, *supra*.  Austin has not cited any record evidence that she was unable to walk independent of a cane.  She has not cited any evidence that a doctor

24

ever prescribed the use of a cane.  And another medical provider repeatedly noted that there was "no indication for cane or WC."  (Tr. 661, 678).  Some of Austin's treatment notes state that her gait was normal and that she had normal strength.  (See e.g., Tr. 688).  Despite this potentially supportive evidence, the ALJ's decision did not explain why he omitted a cane from Austin's RFC, and neither the Commissioner nor this court is permitted to engage in *post hoc* reasoning on the ALJ's behalf.  *Steckroth v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 44895, E.D. Mich. March 30, 2012, quoting *Hyatt Corp v. NLRB,* 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.'") (citations omitted).

Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when: (i) the claimant has been prescribed an assistive device; (ii) the ALJ did not include the use of the device in the RFC assessment; and (iii) did not provide an explanation for the omission.  *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* 2018 U.S. Dist. LEXIS 32651, 2018 WL 1136119, at * 10 (N.D. Ohio Feb. 12, 2018) (quoting *Watkins v. Comm'r of Soc. Sec.,* 2017 U.S. Dist. LEXIS 212997, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017), report and recommendation adopted, 2017 U.S. Dist. LEXIS 205871, 2017 WL 6389607.  Here, the ALJ's decision did not mention Austin's use of a cane and did not explain why he excluded it from her RFC.  Because the ALJ did not "build an accurate and logical bridge between the evidence and the result," *Fleischer,* 774 F. Supp. 2d at 877, the court cannot determine if the evidence regarding Austin's cane was "discounted or merely overlooked." ." *Shrader,* 2012 U.S. Dist. LEXIS 157595.  The ALJ erred by not explaining his omission of Austin's use of a cane in her RFC.

However, an ALJ's error in either failing to include a use-of-a-cane limitation in the RFC or in explaining why he found it unnecessary is harmless when the claimant cannot show that the ultimate determination – that there were a significant number of available jobs – would have been different had such a limitation been included.  *See Humphries v. Comm'r of Soc. Sec.*, No. 18-12123, 2019 U.S. Dist. LEXIS 120705 *26 (E.D. Mich., June 25, 2019); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").  Indeed, courts throughout the Sixth Circuit have held that an ALJ's failure to include a use-of-a-cane limitation (which would have precluded light work) in the RFC was harmless error when the VE's testimony identified several jobs at the sedentary level that would be available to the claimant had the use-of-a-cane limitation been integrated into the RFC finding.  *See, e.g.*, *Plezia v. Comm'r of Soc. Sec.*, No. 1:17-cv-1765, 2018 U.S. Dist. LEXIS 109224 *10 (N.D. Ohio, June 14, 2018) ("The ALJ posed a hypothetical to the VE incorporating sedentary work with the use of a cane for ambulation.  In response, the VE identified a significant number of jobs in the regional and national economies. Therefore, any error with the light work RFC [and the omission of a use-of-a-cane limitation] would be harmless.") (Baughman, M.J.), *adopted by* 2018 U.S. Dist. LEXIS 109214 (June 29, 2018) (Pearson, D.J.); *see also Jozlin v. Comm'r of Soc. Sec.*, No. 12-cv-10999, 2013 U.S. Dist. 33582 *26-28 (E.D. Mich., March 12, 2013) ("[E]ven if the ALJ had included Plaintiff's alleged need to ambulate with a cane in her RFC, as plaintiff indicated, the RFC would have limited her to sedentary work, and the VE testified that jobs existed in the economy for an individual with such limitations."); *Wolford*, 2018 U.S. Dist. LEXIS 88166 *36-37; *Lowery v. Comm'r of Soc. Sec.*, No. 17-12348, 2018 U.S. Dist. LEXIS 102278 *15 n.1 (E.D. Mich., May 29, 2018) ("[E]ven if the ALJ had erred in failing to incorporate [the claimant's] use of a cane into her RFC

findings, any such error is harmless whe[n] the VE testified that 60,000 sorter jobs could still be performed by a hypothetical individual with such restrictions.").

The ALJ's failure to include a use-of-a-cane limitation in Austin's RFC was harmless error. Despite finding that she was capable of performing a range of light work and omitting a use-of-a-cane limitation, the ALJ nevertheless asked the VE whether an individual with Austin's limitations could perform any jobs if she were limited to sedentary work and needed to use a cane. (Tr. 284-285). The VE stated that such an individual could work as a charge account clerk (80,000 jobs available), laboratory tester (12,000 jobs available) or final assembler (25,000 jobs available). The VE opined that these number of jobs would be available at the sedentary level if a use-of-a-cane limitation were added. (Tr. 285). Although the ALJ did not cite this testimony when he found that Austin could perform work in the national economy (Tr.150), it is nevertheless substantial evidence which supports the ALJ's conclusion. *See Sothen v. Comm'r of Soc. Sec.*, No. 1:13-cv-2426, 2014 U.S. Dist. LEXIS 158569 *9 (N.D. Ohio, Nov. 10, 2014) ("[W]hen a reviewing court is not addressing a matter requiring an articulation of reasons by the ALJ, it must look at the record as a whole and may look at any evidence in the record, even that not cited by the ALJ." (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001)).

Because the evidence as a whole indicates that there are a significant number of jobs that Austin could perform, even if she were limited to sedentary work and required a cane for ambulation, she cannot show that the ALJ's ultimate determination would have been different had those limitations been incorporated into Austin's RFC. *Humphries*, 2019 U.S. Dist. LEXIS 120705 *26; *Shinseki*, 556 U.S. at 409; *see also Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902 (6th Cir. 2016) (holding that 6,000 jobs "fits comfortably" within what courts have found significant). Thus, the ALJ's failure to include a use-of-a-cane limitation in Austin's RFC was harmless error.

The court agrees with Austin that, by failing to explain his finding that Austin did not require a cane for ambulation, the ALJ failed to build a logical bridge between the evidence and his RFC determination.  However, this error too was harmless because substantial evidence supported the conclusion.  The record contained treatment notes stating that there was no indication for a cane or wheelchair (Tr. 661, 668), and the VE testified that there would be jobs available for Austin at the sedentary level even if she used a cane.  (Tr. 285).  Thus, even if the cane had been included in the ALJ's RFC finding, it would not have changed his determination that Austin was not disabled.  Because the ALJ's error was harmless and because his finding that Austin was not disabled was supported by substantial evidence, I recommend that the court affirm his decision.

**VI.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Austin's application for SSI be affirmed.

Dated: July 7, 2020

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).